## THE BROADWAY.

## THE ATAGO MARU.
### No. 12761.

District Court, E. D. New York.
Feb. 17, 1933.

Foley & Martin, of New York City (J. A. Martin, of New York City, of counsel), for libelant.

Burlingham, Veeder, Fearey, Clark & Hupper, of New York City (Chauncey I. Clark and Paul Tison, both of New York City, of counsel), for claimant.

BYERS, District Judge.

The stick lighter Broadway, the property of the libelant, was damaged some time between 8 o'clock on the night of October 4, 1931, and 6:30 o'clock the next morning, and the object of this suit is to recover for the damages so sustained.

The lighter was lying outside two other similar vessels at the end of the Barrett pier at Edgewater, New Jersey; that pier occupies a portion of the slip lying north of the Spencer Kellogg pier at that place, and extends out 102 feet, 6 inches from the bulkhead; there is a space 58 feet, 8 inches between it and the Spencer Kellogg pier, which is 467 feet long.

The Broadway arrived on Saturday afternoon, October 3rd, at about 3:00 o'clock, and was made fast, heading down-stream, to an adjoining lighter (the Sidney) on the starboard side; inside of the latter was another similar craft headed up-stream.

The length of these lighters is not given, but they averaged 30 feet in beam, and are assumed to have been between 90 and 100 feet in length; the Barrett pier is about 77 feet wide, and therefore the lighters projected beyond its width, toward the Spencer Kellogg pier, but to what extent has not been established by the evidence; Libelant's Exhibit 1 (a sketch made by a marine surveyor who was called as a witness) indicates that the projection was 8 feet, 10 inches. This was an important element of the situation, but, like certain other significant matters, it was not clarified by testimony.

The claimant's twin screw motor ship Atago Maru docked at the north side of the Spencer Kellogg pier at about 8:00 o'clock in the morning of October 3rd, and was therefore at her berth when the Broadway arrived. The ship is 454 feet long over-all, and has a beam of 57 feet, and her stem was 70 feet from the bulkhead, which means that her stern extended into the North River about 60 feet beyond the end of the pier; as she lay, the port side of the Broadway was about opposite the foremast of the ship, where the latter is said to be about 40 feet wide at the water-line and about 50 feet at her deck.

It will be seen that a projection of the southerly side of the Barrett pier for the full depth of the Spencer Kellogg pier would embrace a slip only 58 feet, 8 inches wide, which could scarcely receive a vessel having a beam of 57 feet, and therefore it is to be regretted that the space that intervened between the bow of the Broadway and the starboard side of the ship has not been definitely shown.

If the ship had a width of 40 feet at the water-line about opposite the Broadway, the latter could have been distant from the sides of the ship a matter of 9½ feet, if her bow was flush with the south side of the Barrett pier; in the absence of proof, it will be assumed that the distance was not less than 5 feet, because it is thought that those responsible for berthing the lighter would not have brought her much closer to the ship without seeking to ascertain which of the two craft would be leaving the berth first. There is no evidence that such an inquiry was made.

On Monday morning, October 5, 1931, at about 6:00 o'clock, the ship backed out of her berth under her own power but assisted by tugs, and it is alleged in the libel that, in the said maneuver, the lines which the steamer had out to the dock were cast off, and she commenced to pass out into the river and, in so doing, her stem was permitted to swing to starboard, and came into collision with the Broadway, and with the lighter *inside* the Broadway; and, in colliding with the Broadway, the steamer struck her port bow corner, and caused the port side to roll under water, and then caused her to roll to starboard and port, and tore out the starboard *forward* bitt, raised the deck, tore off rail, and did considerable other damage to the lighter, and caused the latter to roll over so as to let water pass over its deck and down into its hatches, and caused the lighter to list and throw part of its cargo into the water.

The libel therefore describes the happening as though but three lighters occupied the berth in question, when the damage was caused.

At the trial, however, it appeared that there was a fourth lighter, named Anzac, which, in some undisclosed way, reached a position outboard of the Broadway, and was made fast to the latter, some time during Sunday, October 4th.

The entire handling of and participation by the Anzac in what took place is a mystery from start to finish. Her captain was called as a witness, and his testimony is that he left his boat on Saturday afternoon, October 3rd, light, at pier 22 in Brooklyn, and, when he came down to that place on Monday morning, he found that the boat was gone, and telephoned to his office for orders, and thereafter reported to the Spencer Kellogg pier above described, and expected to find his vessel there; that is to say, he went to the Barrett pier, but his vessel was not there. He learned that she had gone adrift at some undisclosed time, and he finally caught up with her at the 65th Street pier of the New York Central Railroad Company in Manhattan.

The Anzac was observed in position outside the Broadway on Sunday, but no one is able to say whether she was heading down or up river, or how she was made fast to the Broadway, except that the libelant's witness De Luzio, who acted as pier watchman on Sunday, saw the four boats lying snug, close together; that is, 3 or 4 feet apart, with two lines "one in the front and one in the back"; he last saw them at 8:00 o'clock at night, but not later, because of fog.

At 5:15 a. m. on the morning in question, the Anzac was in collision with the yacht Placida, which at that time lay anchored toward the Jersey side of the river, off the Columbia Yacht Club, which is situated at 86th Street on the Manhattan side; the lighter was sighted a few hundred feet up the river, drifting down in the tide, and the yacht's captain and mate were called by the quartermaster on duty, and enough of the crew were summoned to hold off the lighter from the port side of the yacht after she had struck the port bobstay of the latter; the lighter passed alongside and then astern, and it was observed from the yacht that there was no one on board the Anzac; at about 6:40, as has been stated, this lighter was taken in tow by a New York Central tug, which tied her up at pier 65, North River, on the Manhattan side.

How the Anzac got from Brooklyn to Edgewater, who made her fast there and how, and the circumstances of her departure are not the subject of any testimony at all.

In the libelant's brief, the theory of what took place is thus advanced: "When the steamer struck the Broadway and hit her backwards as described by deLuca, the boat went in between the Broadway and the Anzac, pulling her free, pushed her stern end out and swung her bow down against the steamer as indicated by the black paint found on the bow of the Anzac." The difference is apparent between the foregoing, and the description of what took place according to the libel.

The damage to the Broadway involved:

One frame broken 6x10x7; the starboard *after* bitt was pulled out, and the deck in the vicinity was started; bitt pin on starboard bow bitt was bent upward, and top plank in the bow was broken, 4x10x30; 4 rake timbers were broken, and one rake timber was slightly split.

The Broadway's cargo consisted of 4,055 bags of beans, which were properly tiered, and of these 2,390 were lost overboard or damaged by water, and the balance, 1,665 bags, were in good condition. There was much water below, in the port side of the hull, which caused the list.

The problem is to discover if the testimony shows that the Atago Maru did the damage.

At about 6:00 o'clock in the morning, everything aboard the ship had been made ready for departure, and the tugs R. J. Barrett and Grace Barrett were at the pier, ready to assist. The position of the tugs is the subject of conflicting testimony, which will be briefly considered. Emanuel G. Slauer, the captain of the R. J. Barrett, went aboard the ship, and acted as the pilot in the undocking. He reported on the bridge at about 6:00 o'clock, and at once assumed charge of the maneuver; the ship was held in position by spring lines from her port side to the pier, and two bow lines leading to the bulkhead, which were there made fast around one bitt. The side lines were heaved, and the engine movements, according to the log, were as follows:

Stern slow ........................ 6:09
Stop ............................. 6:10
Stern slow ........................ 6:11
Starboard stop ..................... 6:14
Starboard half ahead ................ 6:15
Starboard stop ..................... 6:16

After sternway had started, first the starboard then the port bowline was let go, but it is impossible to tell from the testimony exactly where the stem of the ship was when this happened; the testimony for the claimant is that, before the pier was cleared, both tugs were head on against the side of the ship at her port quarter, for the purpose of holding her up against the ebb tide which had been falling for about five hours. The force of the tide in the river was 1.8 miles per hour. The wind was light, being out of the south, of a force not to exceed 5 miles an hour, and had no effect on the maneuver.

The testimony for the libelant is that there was but one tug in the position stated as the ship acquired sternway motion, and that the other tug, the Grace Barrett, was around on the starboard side forward; such testimony requires consideration, because, if it is true, the tug had to lie practically alongside the lighter Broadway at this time.

The captain of the Grace Barrett denies that his boat occupied that position, and explains that, on arrival a few minutes before 6:00, he dropped around the stern of the Atago Maru to observe conditions on her starboard side to see if everything was clear, and particularly if there were any lines leading from the lighters to the ship. He observed none, and was convinced from what he saw that there was ample room between the lighters and the ship for the latter to safely emerge from her berth, and thereupon his tug went around to the port quarter of the ship as stated.

After the Atago Maru cleared the dock and was lying in the stream, the testimony for the claimant is that the Grace Barrett did go around the ship's bow and take a position on the starboard side forward, for the purpose of shoving the bow down the river; at all times the R. J. Barrett is conceded to have been on the port side of the ship at the port quarter.

One of the libelant's witnesses says that she had her nose pointed against the ship's side, and that her propeller was turning; the other says that this tug never assumed such a position at all but lay with her bow pointed toward the end of the pier. It is manifest that the latter witness was mistaken, and the conflict of testimony as to the position of the Grace Barrett is resolved in favor of the claimant's version; first, because, as a matter of common sense, there would be no necessity for the Grace Barrett to assume a position on the starboard side of the ship until after it became possible for the latter

to head down-stream; and second, because there was no room for the tug to occupy a position between the foremast and the stem of the ship on the starboard side since that place was occupied by lighters.

The only evidence produced by the libelant to sustain its theory of damage to the Broadway, either as stated in the libel or as advanced in the brief, is that of the witness deLuca, who was standing on the bulkhead; he indicated, on Libelant's Exhibit 1, that he stood there about opposite the down-river end of the lighters as the ship backed away from the pier; he said: "I seen the ship, the time he go back, slide along the Broadway boat * * * slide along the side of Broadway boat, what you call it, the post * * * on top, knock on top of the wood." Later he said that he saw the stick on the lighter go from side to side.

This witness did not remain in his post of observation because he had to start on his job which was to run machinery, and he did not want to lose any time; at noontime he went down to look at the Broadway, and observed that it had a red mark where it hit the ship—this mark was red paint.

It is significant that this witness saw only three barges at the time. In reference to the tug Grace Barrett, it should be remarked that this witness did not see any tugs as the ship was pulling out, although the starboard side of the Atago Maru was in his line of vision.

There is no other evidence in the record of a collision between the ship and the lighter.

From the nature of the damage, it is doubtful if it could have been occasioned by such a contact as the witness deLuca describes; even though the bow of the ship inclined somewhat to the starboard as sternway was gathered, the rubbing of one vessel against the other would scarcely account for the very considerable damage which has heretofore been described, particular reference being had to the tearing out of the stern bitt on the starboard side. The captain of the Broadway testified that he had two 5-inch lines out to the Sidney, of three parts; i. e.: "I had an eye on the Sidney, and then around, turn around my bitt; that makes just three parts, and I make fast to my own bitt." The lines were new and in good condition.

The testimony of the captain as to the condition which he discovered on the Broadway when he boarded her Monday morning about 9:00 o'clock, so far as the lines are concerned, is as follows:

"Q. Will you tell us what you found in reference to the bitts?

"A. The starboard bitt aft was pulled out.

"Q. Did you find that bitt?

"A. It was hanging alongside the Sidney on his after bitt.

"Q. Where was the line?

"A. The line was fast to the bitt. * * *

"A. * * * It was my line that was fast to the bitt.

"Q. Was that line broken?

"A. No, sir.

"Q. Was it still three parts?

"A. Yes. * * *

"Q. How was the bow line?

"A. The bow line, I found that the iron pin had bent up so the bight, I suppose, had slipped off, so she was hanging on one single line. * * *

"Q. Was that bow line broken?

"A. No, sir."

It may be judged from the foregoing that the force which tore loose the starboard stern bitt on the Broadway could scarcely have been the result of the sliding along described by the witness deLuca. One would expect that such a force must have involved a forward thrust of some kind. If a wedge had been inserted between the Broadway and the Sidney, the pressure on the bowline would have tended to separate the two lighters aft, but the bowline would have been parted or severely damaged if the thrust were powerful enough to pull out the stern bitt; however, there is no testimony that the bowline was damaged.

The swaying of the mast on the Broadway, which deLuca saw, was compatible with the disturbance of the water caused by the ship's movement in leaving her berth, but does not establish such a striking of the lighter itself as is described in either the libel, or the quoted portion of libelant's brief.

If the wedge were inserted between the Broadway and the Anzac—assuming for a minute that the Anzac was then alongside the Broadway, which is incompatible with all the testimony in the case—the Anzac and the Broadway would tend to separate aft, and that would have forced the stern of the Broadway over toward the Sidney and not away from it, and hence this version would not account for the pulling out of the bitt on the stern starboard end of the Broadway.

There is another reason for finding that the mechanics involved were opposed to the libelant's theory; namely, the inability of the Atago Maru to pivot on the outboard end of the dock sufficiently to strike the Broadway the kind of a blow that would have been necessary to inflict any such damage as the survey reveals; the ship was 454 feet long, which would place her center about 227 feet aft of the stem; when she had moved far enough aft for a point amidships to rest on the pier end, if the ebb tide overcame the up-river pressure of the tugs on her port quarter sufficiently to swing her stern downstream, the stem would have moved to starboard in an arc at least 30 feet outboard of the Broadway; that is to say, the ship's stem would have struck the Anzac if the Anzac had been in position, but not the Broadway.

The claimant's testimony is in part that the stern line leading from the Broadway to the Sidney was not made fast at the time that the ship moved out of the slip; as the tide had been falling, it is natural to suppose that the stern of the Broadway swung away from the Sidney and perhaps tended to range her alongside the Atago Maru, which may explain the expressions of deLuca when he spoke of the ship's sliding "along the side of Broadway boat" and hitting the boat backward, and again when he said: "I didn't watch for the ship to pull all the way out. I just look at the time she slide along the ship"; if this is so, it fails to explain the nature of the damage at the forward end of the Broadway.

There were streaks of red paint on the latter, and it may be assumed that they were the result of the sliding along in question, but they do not account for the damage to the structure of the lighter itself.

The foregoing consideration of the evidence has to do with the libelant's case. The testimony for the claimant is directly to the effect that there was no contact between the ship and the lighter, and the first officer, who was on the bow, says that he went to the starboard side to observe the lighters as the ship moved out, and that, at this time, the Broadway already had a bad list, and some of the bags of her cargo were hanging over and into the water, and, if the ship had touched her, she would have capsized, but that there was no touching.

It is difficult to disregard this evidence entirely, because to do so would be to brand it as intentionally false, and, while it came from the lips of an interested witness, as did that of the pilot and the captain, these have not been discredited, and the contrary is not

sought to be argued except with respect to one incident which perhaps requires attention.

After leaving the Spencer Kellogg pier, the ship proceeded to the pier of the American Sugar Refining Company in Brooklyn, and, in a day or two, to Boston, and was there examined by surveyors; these discovered, to their own satisfaction at least, that there was fresh paint on the hull of the ship at the bow on the starboard side, having a width of about 7 feet near the deck and extending irregularly so as to cover a fore and aft area of from 12 to 15 feet, down to the surface of the water. This embraced black paint as far as the water-line, and red paint below. This fact is thought to indicate that, after leaving the Spencer Kellogg pier, the effort was made to conceal whatever evidence of contact might have been disclosed, had the painting not been done. For the purpose of this decision, it will be assumed that such was the fact, but this does not prove that there was anything more that occurred at Edgewater than the libelant's witness deLuca says there was; namely, a rubbing along of the Broadway by the ship as she pulled out of the berth. She went out nearly straight because she was a twin screw vessel, and the stopping of the starboard engine at 6:14 means that it was desired to apply pressure on the port side of the ship at that time; hence there probably was some sagging down river at the ship's stern in spite of the efforts of the tugs to hold her up. But these things, being admitted, do not account for the damage to the hull of the Broadway revealed in the survey.

The libelant was handicapped by a lack of evidence which might have been adduced if any of the lighters had been manned during the night of Sunday, October 4th, and particularly if the movements of the Anzac had been accounted for, but this hiatus in proof cannot be visited upon the claimant in the form of a decree against it. If the Broadway took up a position, on Saturday afternoon, October 3, 1931, which was too close to the ship for safe maneuver by the latter in leaving the pier, the least that could have been expected on her behalf was the maintenance of a watch on board in a position to take whatever precautions might be necessary when the ship should unberth; viewing the evidence as a whole, it is not thought that the libelant has sustained its burden of proof.

A decree may be submitted, dismissing the libel, with costs, to be settled on notice.

If findings are desired, they may be settled at the same time, and are to embody appropriate recitals as to ownership and incorporation.